8 F.3d 29
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Barbara SCHRAEGER; Sheila Purcell, Plaintiffs-Appellants,
v.
CITY OF SAN FRANCISCO, Claude Everhart, Art Agnos, Maggie
Jacobsen, San Francisco Labor-Management Work
Improvement Project, Inc., Defendants-Appellees.
 No. 92-15554.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 9, 1993.
Decided Sept. 16, 1993.
 
 Before SNEED, POOLE, and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellants challenge the district court's disposal of their § 1983 cause of action by a summary judgment on their First Amendment claim based on the absence of municipal liability and a dismissal of their due process claim based on the absence of a constitutionally protected property interest. We affirm the district court.
 
 I.
 FACTS AND PRIOR PROCEEDINGS
 
 3
 In 1980, the City of San Francisco and the public employee unions signed a Letter of Commitment to establish the Work Improvement Plan (WIP), a neutral nonprofit corporation designed to facilitate labor relations between San Francisco and its employees. From that time, the Mayor's office entered into a series of written 1 year contracts with WIP, the last of which was signed for the fiscal year ending June 30, 1989. The contracts said that the City could cancel the contract simply by giving 30 days notice.
 
 
 4
 Appellant Barbara Schraeger was the project director of WIP from 1982 until its termination in 1989, and appellant Sheila Purcell started with WIP in 1988. Both appellants were independent contractors, not employees of the City or WIP.
 
 
 5
 Schraeger and Purcell claim that the appellees (collectively "the City") made several representations that the WIP contract would be renewed for the 1989-90 fiscal year. But on May 25, 1989, Deputy Mayor Claude Everhart informed Schraeger that the Mayor's office would not renew WIP's contract for the next year. The money allocated for the WIP program was to be used to fund the Employee Relations Division (ERD), a new part of the Mayor's office that would perform, among its other duties, the labor relations tasks previously supplied by WIP. Everhart, who was also a member of the WIP Board, repeated this announcement at the WIP Board of Directors meeting on May 26, 1989. On May 30, Art Agnos, the Mayor of San Francisco at the time, wrote to Schraeger informing her that the WIP contract was to be terminated for the coming fiscal year because of budgetary considerations.
 
 
 6
 The appellants organized opposition to the Mayor's decision, and various individuals testified against the Mayor's action at the Board of Supervisors' Finance Committee hearings on June 14 and June 23, 1989. On June 23, the Mayor's office offered a compromise that would have restored funding to WIP. Also on June 23, two co-chairs of WIP signed a statement to express their "wish to formally go on the record to state that we intend to continue to employ" both Schraeger and Purcell for the 1989-90 fiscal year.
 
 
 7
 On July 14, 1989, WIP held a board meeting, at which Deputy Mayor Everhart indicated that the Mayor's office was committed to signing a contract with WIP, though some changes were in order. The WIP Board authorized Schraeger and Purcell to continue working. Everhart left the meeting early, and Schraeger then informed the WIP Board that the WIP-City contract for the previous year had been altered and a photocopy of her signature had been affixed to it without her knowledge. Someone had added a provision that gave the Mayor's office control of hiring and firing.
 
 
 8
 A co-chair of WIP, Barney Barron, called Everhart to set up a meeting to finalize the WIP contract. During this conversation, Barron mentioned the contract alteration. According to the appellants, Everhart became upset and said there was no point in meeting.
 
 
 9
 Appellant Schraeger met with Nancy Walker, a member of the Board of Supervisors, on July 20, 1989 to discuss the WIP situation. After this meeting, Walker wrote a letter to Everhart indicating that the WIP matter should be resolved. Everhart responded that he wanted the matter resolved as well, and he informed Walker that Maggie Jacobsen, the new head of ERD, was now in charge of the negotiations. Jacobsen, Walker, and Everhart met, but they did not reach an agreement.
 
 
 10
 According to the appellants, Jacobsen met with four WIP Board members on September 20, 1989 and told them that Schraeger was a problem, and that the contract would be signed if she were not the project director.
 
 
 11
 In October of 1989, the Mayor's office proposed contracting with Ross Consulting, another neutral labor relations facilitation firm, instead of WIP. The Mayor's office planned to use money budgeted for WIP to pay for the Ross contract. The unions were opposed to the substitution. The Board of Supervisors eventually rescinded the money originally allocated for the WIP contract to halt the Mayor's proposal.
 
 
 12
 On July 2, 1990, the appellants filed the present suit against the City. They claimed that the Mayor's decision not to renew the WIP contract was in retaliation for Schraeger's lobbying against the termination of WIP and her accusation concerning the alteration of the previous year's contract. Appellants sought damages under 42 U.S.C. § 1983 and various pendent state law causes of action.
 
 
 13
 The district court granted the City's motion to dismiss the due process claim stating the appellants had no protected property interest in continued employment with WIP, but denied the motion to dismiss the First Amendment claim. The district court later granted the City's motion for summary judgment on the First Amendment claim stating that there was no municipal liability and the individual defendants were protected by qualified immunity.[1] Since only state law claims remained, the court dismissed them without prejudice for refiling in state court pursuant to 28 U.S.C. § 1367(c)(3). The appellants timely filed their notice of appeal.
 
 II.
 JURISDICTION AND STANDARDS OF REVIEW
 
 14
 The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and this court has jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 15
 This court reviews a district court's decision to grant summary judgment de novo. Hunt v. Dental, 865 F.2d 198, 200 (9th Cir.1989). This court must determine whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. Id. This court reviews de novo the district court's decision to dismiss a claim. Love v. United States, 915 F.2d 1242, 1245 (9th Cir.1989). Dismissal is not proper unless the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Id.
 
 III.
 DISCUSSION
 
 16
 A. Municipal Liability.
 
 
 17
 The appellants contend that the Mayor's office refused to renew WIP's contract in retaliation for their lobbying efforts and their accusations of contract alteration, and that this refusal subjects the City to municipal liability because the Mayor's office's is the final policy making authority in the area. We disagree.
 
 
 18
 A municipality may be held liable under § 1983 only for actions that represent official municipal policy; it may not be held liable under a theory of respondeat superior. Monell v. Department of Social Serv., 436 U.S. 658, 691, 694 (1978). Acts of a municipality are those that are officially ordered or sanctioned, and even a single act will suffice. Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986) (plurality opinion). Liability will attach, however, only where an official with final policy making authority with respect to the subject matter in question makes a deliberate choice to follow a course of action that causes a constitutional injury. Id. at 483-84.
 
 
 19
 Whether a particular official has final policy making authority is a question of state law. Id. at 483. In California, a city's charter controls on municipal issues. City and County of San Francisco v. Patterson, 202 Cal.App.3d 95, 102 (1988).
 
 
 20
 To determine whether the Mayor's office was acting as a final policy maker when it did not renew WIP's contract, we must first characterize the nature of that action. The parties argue over whether it was a contracting or labor relations decision. Once we have made that determination, we must determine if the Mayor's office had final policy making authority in that area.
 
 
 21
 1. Nature of the Decision.
 
 
 22
 The appellants argue the decision not to renew WIP's contract was a labor relations decision, and the City argues it was a contracting decision. The district court reasoned that the decision was a contracting decision. The court held that the Board of Supervisors, not the Mayor's office, had final policy making authority with respect to general contracting policy, and therefore, the Mayor's office's decision could not subject the City to liability. We agree with the district court.
 
 
 23
 The appellants argue that the decision was a labor relations decision because it terminated the existence of an important labor facilitation mechanism that was widely used by the City and its employees. They note that many of the City's labor contracts called for WIP's participation in various situations. We disagree with this characterization of the decision.
 
 
 24
 The decision to not renew the WIP contract was a contracting decision, not a labor relations decision. The decision, as such, did not set or alter the City's labor policy, although its consequences could affect such policy. Furthermore, WIP and the appellants were not City employees, but rather were independent contractors. Primarily, this was a decision to discontinue the services of an independent contractor, not to terminate a labor relationship between the City and any of its employees. The fact that the contract concerned a labor facilitation mechanism does not transform that contracting choice into a labor decision.
 
 
 25
 2. Final Policy Making Authority for Contracting Decisions.
 
 
 26
 Now that we have determined that the decision to not renew the WIP contract was a contracting action, we must determine whether the Mayor's office had final policy making authority in the contracting area. We hold that it did not.
 
 
 27
 The most direct method of ascertaining who had final policy making authority is to examine the City's Charter. Section 2.101 vests the Board of Supervisors with broad general powers to establish city-wide policy. "[A]ny restriction on the power of the board must be explicitly provided by the charter or accomplished by charter amendment." Patterson, 202 Cal.App.3d at 103. Such a specific divestiture of power was seen in the transfer of labor relations power to the Mayor's office. San Francisco WIP Charter § 3.100-2 ("The mayor shall assume all labor relations responsibilities previously vested in the board of supervisors.").
 
 
 28
 This section did not divest the Board of Supervisors of general contracting policy authority, even as it relates to matters affecting labor relations. Furthermore, the Board of Supervisors has exercised its policy making authority in the contracting area by implementing various policies that apply to all contracting decisions, such as anti-discrimination rules. See San Francisco Admin.Code Chapter 12. The Board of Supervisors had final policy making authority over general contracting policy.
 
 
 29
 The appellants argue that despite the lack of any Charter based contracting policy authority, the power and broad discretion of the Mayor's office made it a de facto final policy making authority. We disagree.
 
 
 30
 The appellants first argue that the Mayor's veto power makes the Mayor's office a final policy maker for all ordinances. The Mayor may veto an ordinance to stop it from becoming effective. San Francisco Charter § 2.302. This includes, it is argued, the WIP contract, which is an ordinance like any other City contract.
 
 
 31
 This argument is too broad. It would mean that the Mayor's office has final policy making authority for basically all decisions. It is true that the Mayor's office has a good deal of power, but in San Francisco, where the Charter vests general control in the Board of Supervisors, the Mayor's office is not the final policy making authority for all decisions. Furthermore, while the Mayor's office must sign or veto a particular ordinance, that does not necessarily mean the office had any input into the substance of that ordinance.
 
 
 32
 Additionally, the Board of Supervisors may override a veto by a two-thirds vote. San Francisco Charter § 2.303. This refutes the notion that veto power vests the Mayor with final policy making authority. The Eleventh Circuit reasoned that because a city council had the power to override the Mayor's veto, the Mayor was not the ultimate policy making authority. Manor Healthcare Corp. v. Lomelo, 929 F.2d 633, 637-38 (11th Cir.1991).
 
 
 33
 The appellants next narrow their focus and argue that the Mayor's broad discretion, in making the WIP decision and the nonreviewability of that decision, made the Mayor's office a final policy maker. The Supreme Court said, "The fact that a particular official--even a policy-making official--has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." Pembaur, 475 U.S. at 481-82 (citations omitted). The Court has also said that when an official's "decision is subject to review by the municipality's authorized policymakers" that official does not have final policy making authority. City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (plurality opinion).
 
 
 34
 It is true that the Mayor's office did have discretion to terminate the WIP contract, but the Board of Supervisors also had some control over some consequences of the termination. The Board of Supervisors could not force the Mayor's office to renew the WIP contract, but they could, and did, rescind the money allocated for that contract so that it could not simply replace WIP with Ross Consulting. So the plan of the Mayor's office was subject to some review and its discretion was not unlimited. The Mayor's discretion did not vest that office with final policy making authority for contracting decisions.
 
 
 35
 We hold that the Mayor's office was not a final policy making authority for contracting decisions and the City is not subject to municipal liability on the § 1983 claims.
 
 
 36
 B. Due Process.
 
 
 37
 Because we hold that the City is not subject to municipal liability, the appellants' only possible claim for a due process violation lies against the individual appellees. The district court, though, properly dismissed the due process claim because the appellants did not have a constitutionally protected property interest in continued employment with WIP.
 
 
 38
 Due process only protects against the deprivation of liberty and property interests within the scope of the Fourteenth Amendment. Board of Regents v. Roth, 408 U.S. 564, 569 (1972). Property interests, however, are not created by the Constitution; their source is rules and understandings stemming from an independent source, such as state law. Id. at 577. To have a property interest, a person must have more than an abstract need or a unilateral expectation; protection by the Fourteenth Amendment requires that a person have a legitimate claim of entitlement. Id.
 
 
 39
 The appellants in this case had no reasonable expectation or entitlement to continued employment with WIP. WIP's relationship with the City, and thus necessarily the appellants' relationship with the City, was governed by the WIP-City contract. This contract specifically provided for termination upon 30 days notice without any other restrictions. The appellants, therefore, were not legitimately entitled to continued employment or the renewal of the WIP-City contract.
 
 
 40
 Appellants nevertheless argue that they have a protected property interest in continued employment with WIP based on the document signed by the co-chairs of WIP stating their intent to hire the appellants. The document signed by the co-chairs of WIP, however, had no binding effect on the City. All city contracts must be signed and approved by the City Attorney to be binding on the City. San Francisco Charter § 3.401. The contract and the Letter of Commitment, not this so-called employment contract, determined the rights and obligations of WIP and the City.
 
 
 41
 The appellants also claim they have a protected property interest in continued employment with WIP based on promissory estoppel. They say the appellees made promises, representations, and assurances to them that the City would fund WIP for the 1989-90 fiscal year. And that based on these promises, they continued to work for WIP.
 
 
 42
 Estoppel can be invoked against a government entity under California law, but it is not favored. See generally, 30 Cal.Jur.3d, Estoppel and Waiver § 5, p. 781, 783 (1987). The City could be bound by the terms of the contract if the elements of estoppel are present and if the injustice that would result without estoppel justifies any effect on the public interest. Barrett v. Stanislaus County Employees Retirement Ass'n, 189 Cal.App.3d 1593, 1607 (1987).
 
 
 43
 This case does not qualify for estoppel. The hostility of the Mayor to renewal of the contract in no way suggests a clear promise to renew the contract. Furthermore, there is a strong public interest in government contracts being written and approved in the proper manner. See San Francisco Charter § 3.401 (all ordinances, including the WIP contract, must be written and approved by the City Attorney). The possibility of contracting by oral assurances raises the spectre of rash decisions, corruption, and secret dealings. The detrimental effect on the public interest outweighs any interest the appellants have in invoking estoppel.
 
 
 44
 Finally, the appellants' reliance on Merritt v. Mackey, 827 F.2d 1368 (9th Cir.1987) and DiMartini v. Ferrin, 889 F.2d 922 (9th Cir.1989), amended, 906 F.2d 465 (1990), cert. denied, 111 S.Ct. 2796 (1991), to demonstrate a property interest is misplaced. Both cases are distinguishable. In Merritt, the employer's personnel policy said that employees could be fired only "for cause," and this gave the plaintiff a protected property interest. 827 F.2d at 1371. The appellants had no similar protections that would justify a reasonable expectation of continued employment. DiMartini simply stated that a plaintiff can have a protected property interest in private employment, 906 F.2d at 466-67; it does not support the appellants' claim that they have such an interest.
 
 
 45
 The appellants did not have a protected property interest in continued employment with WIP, and therefore, they have no due process claim against the individual defendants.
 
 
 46
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The appellants do not challenge the district court's holding that the individual appellees were entitled to qualified immunity on the First Amendment claim